In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00301-CV**
_____

**BRAVERMAN MANAGEMENT, INC., Appellant**

**V.**

**MTILL HOLDINGS, LLC, Appellee**

_____

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 22-10-14560-CV**
_____

**MEMORANDUM OPINION**

Braverman Management, Inc. appeals the trial court's final judgment awarding MTill Holdings, LLC $153,418.11 in damages for breach of contract and $37,498.52 in attorney fees. Braverman complains that the trial court erred because (1) the damages were not offset by the amount required under the lease, (2) the damages were not calculated based upon the agreed lease rate, (3) the trial court relied upon inadmissible, unsubstantiated evidence of brokerage fees, (4) the trial court incorrectly calculated late fees, and (5) the trial court awarded attorney's fees

1

in an amount contrary to Texas law. For the reasons discussed below, we affirm the trial court's judgment.

## Background

On November 18, 2019, MTill and Evergreen Office 2012, LLC, executed a Lease Agreement ("Prime Lease") whereby MTill leased office space in the Evergreen Circle Office Building for a term of five years beginning January 1, 2020. On February 1, 2021, with Evergreen Office's consent, MTill and Braverman executed a Sublease wherein Braverman subleased 4,265 square feet of office space and 1,285 square feet of balcony space on the third floor of the building for a term of 47 months, ending on December 31, 2024. In a Consent to Sublease contemporaneously executed by Braverman, MTill and Evergreen Office, the parties agreed the Sublease would be subject to and subordinate to all of the terms and conditions of the Prime Lease. Moreover, the Sublease states:

> This Sublease is subject and subordinate to the Prime Lease. Except as may be inconsistent with the terms hereof, in which event the Prime Lease shall control, all the terms, covenants and conditions in the Prime Lease shall be applicable to this Sublease with the same force and effect as if the Sublessor were Landlord under the Prime Lease and Sublessee were Tenant thereunder. In case of any breach hereof by Sublessee, Sublessor shall have all the rights against Sublessee as would be available to Landlord against Tenant under the Prime Lease if such breach was made by Tenant thereunder.

Under the terms of the Sublease, Braverman agreed to pay MTill a monthly rental rate comprised of a base rental rate plus 28.43% (calculated as a pro-rata share of the total interior square footage of the office building) of the Common Area Maintenance Costs ("CAM") "as determined by [Evergreen Circle]" and as "more specifically described in the Prime Lease." According to the terms of the Prime Lease, Evergreen Office conducts an annual reconciliation of operating expenses by April 1 of each year and adjusts the CAM rate accordingly. The Prime Lease provides:

> Tenant's Proportionate Share: Estimated Monthly Payments. Tenant's obligation with respect to payment of Operating Expenses shall begin as of the Rent Commencement Date, and shall be equal to Tenant's Proportionate Share of Operating Expenses. For the purposes hereof, "Tenant's Proportionate Share" shall be deemed to be 28.43% on the Lease Commencement Date. Landlord shall make a good faith estimate of the Operating Expenses to be due and payable by Tenant for any calendar year or part thereof during the Term, and Tenant shall pay to Landlord as Additional Rent, on the first day of each calendar month thereafter, together with the payment of Base Rent, an amount equal to Tenant's Proportionate Share of the estimated Operating Expenses for such calendar year (or part thereof) divided by the number of months therein ("Estimated Operating Expenses"). Any amounts paid based on any such estimate shall be subject to adjustment as herein provided when the actual amounts constituting Tenant's Proportionate Share of Operating Expenses are available for each calendar year. Tenant shall be bound and obligated (and hereby agrees) to pay Tenant's Estimated Operating Expenses contemporaneously with each required payment of Base Rent hereunder, on the first day of each calendar month, monthly in advance, for each and every month in the Term beginning on the Rent Commencement Date, in lawful money of the United States of America.

On March 26, 2021, MTill and Braverman executed a First Amendment to Agreement of Sublease, effective April 1, 2021. The terms of the Sublease were modified so that in addition to the 4,265 square feet of interior office space on the third floor, Braverman would also sublease 5,680 square feet on the second floor for a total of 9,945 square feet. As a result, CAM increased to 66.30%, representing the revised pro-rata share of the total office space. Relevant to this appeal, the Amended Sublease provided that for the term of April 1, 2022 to March 31, 2023, the base rental rate was $23.06 and the estimated CAM was $12.32, for a total of $35.38 per square foot. From April 1, 2023 to March 31, 2024, the base rental was $23.64 and the estimated CAM was $12.32, for a total of $35.96 per square foot. Lastly, from April 1, 2024 to December 31, 2024, the base rental was $24.23 and the estimated CAM was $12.32, for a total of $36.55 per square foot. Like the original Sublease, the Amended Sublease is subject to and subordinate to the Prime Lease.

The Prime Lease provides alternative remedies upon default, but only one is relevant to this appeal:

> 25. <u>Remedies</u>. Upon any Event of Default, Landlord may, in addition to all other rights and remedies afforded Landlord hereunder or by law or equity, take one or more of the following actions:
>
> …
>
> (b) <u>Termination of Right of Possession</u>. Terminate Tenant's right to possession of the Leased Premises without terminating this Lease by giving written notice thereof to Tenant, in which event Tenant shall pay to Landlord (i) all rent accrued hereunder through the date of

4

termination of possession, (ii) all amounts due from time under Section 26(a), and (iii) all rent and other sums required hereunder to be paid by Tenant during the remainder of the Term, diminished by any net sums thereafter received by Landlord through re-letting the Leased Premises during such period. Landlord shall use reasonable efforts to re-let the Leased Premises on such terms and conditions as Landlord, in its sole discretion, may determine (including a term different from the Term, rental concessions, and alterations to, and improvements of, the Leased Premises). Landlord will not be liable for, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to re-let the Leased Premises or to collect rent due for such re-letting, Tenant will not be entitled to the excess of any consideration obtained by re-letting over the rent due hereunder. Reentry by Landlord in the Leased Premises will not affect Tenant's obligations hereunder for the unexpired Term, rather, Landlord may, from time to time, bring action against Tenant to collect amounts due by Tenant.

Under Section 26(a) of the Prime Lease, Tenant is responsible for the following costs upon termination of right of possession by Landlord:

Landlord Costs. Tenant shall pay to Landlord all costs incurred by Landlord (including court costs and reasonable attorney's fees and expenses) in (i) obtaining possession of the Leased Premises, (ii) removing and storing Tenant's or other occupant's property, (iii) repairing, restoring, altering, remodeling, or otherwise putting the Leased Premises into condition acceptable to a new tenant, (iv) if Tenant is dispossessed of the of the Leased Premises and this Lease is not terminated, re-letting all or any part of the Leased Premises (including brokerage commissions, cost of tenant finish work, and other cost incidental of such re-letting), (v) performing Tenant's obligations that Tenant failed to perform, and (vi) enforcing the provisions of this Lease, or advising Landlord of its rights, remedies, and recourse in connection therewith.

Under the Prime Lease, failure to pay rent by the fifth day of the month would subject Braverman to a late payment charge equal to five percent of the delinquent amount plus interest at the rate of ten percent per annum.

5

Braverman abandoned the property in October 2022 and does not dispute that it breached the Sublease and Amended Sublease. On October 13, 2022, MTill sent "Notice of Termination of Right and Possession and Demand for Payment" to Braverman. MTill secured a new tenant, American State Bank, for the third floor effective December 1, 2022. MTill began re-occupying the second floor effective May 1, 2023.

MTill sued Braverman for breach of contract. Braverman filed a general denial. A bench trial was conducted on May 30, 2024. MTill presented evidence that its total damages (excluding attorney's fees) were $153,418.11, broken down as follows: $121,220.67 in unpaid rent (base rent and CAM) for the second floor for seven months (from October 2022 when Braverman abandoned the lease to May 2023 when MTill re-occupied the space); $25,149.28 in unpaid rent (base rent and CAM) for the third floor for two months (from October 2022 when Braverman abandoned the lease to December 2022 when the space was leased to the bank); $1,812.39 in five-percent late fees for rent unpaid less than one year; $14,351.52 in ten-percent late fees for rent unpaid in excess of one year; less a credit of $17,300.33 for the second-floor security deposit; less a credit of $12,990.48 for the third-floor security deposit; plus a 2% commission of $7,055.02 to Tarantino Properties and a 4% commission of $14,110.04 to J. Beard Real Estate to re-let the third floor. MTill

6

also presented evidence that it incurred $37,498.53 in reasonable and necessary attorney fees.

The trial court signed a final judgment awarding MTill $153,418.11 as damages and $37,498.53 as reasonable and necessary attorney's fees. In its Findings of Fact and Conclusions of Law, the trial court detailed its calculations of damages. It further found that Braverman waived the affirmative defense of offset because Braverman failed to plead it.

Braverman appealed the trial court's final judgment. In five issues on appeal, Braverman complains that (1) the trial court miscalculated the total third-floor damages because it (i) failed to consider offset amounts and (ii) relied upon inadmissible, unsubstantiated amounts for brokerage fees; (2) the trial court miscalculated the second-floor damages because it failed to calculate damages based on the terms of the lease; (3) the trial court erred in its award of late fees because it used incorrect calculations for the second and third-floor damages; and (4) the trial court awarded excessive attorney's fees.

Standard of Review

In a bench trial, the trial court, as factfinder, is the exclusive judge of the credibility of witnesses, determines the weight of the testimony, and is tasked with resolving any inconsistencies in the evidence and drawing inferences from basic facts to ultimate facts. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-21 (Tex.

7

2005); *Macpherson v. Aglony*, No. 09-21-00004-CV, 2022 Tex. App. LEXIS 7105, at \*35 (Tex. App.—Beaumont Sept. 22, 2022, no pet.) (mem. op.). "When a trial court makes specific findings of fact and conclusions of law following a bench trial and a reporter's record is before the appellate court, the findings will be sustained if there is evidence to support them, and the appellate court will review the legal conclusions drawn from the facts to determine their correctness." *Macpherson*, 2022 Tex. App. LEXIS 7105, at \*36 (citing *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 789 (Tex. App.—Houston [14th Dist.] 2016, no pet.)). Findings of fact entered in a bench trial have the same force and dignity as a jury's answers to jury questions. *See Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). In an appeal from a bench trial in which the trial court made findings of fact and conclusions of law, appellants should challenge the sufficiency of the evidence supporting specific findings of fact rather than directing such a challenge generally at the judgment as a whole. *See Thompson & Knight LLP v. Patriot Expl., LLC*, 444 S.W.3d 157, 162 (Tex. App.—Dallas 2014, no pet.); *Carrasco v. Stewart*, 224 S.W.3d 363, 367 (Tex. App.—El Paso 2006, no pet.). "'If the appellant does not challenge the trial court's findings of fact, when filed, these facts are binding upon both the party and the appellate court.'" *Cahill v. Cahill*, No. 09-20-00206-CV, 2022 Tex. App. LEXIS 792, at \*18 (Tex. App.—Beaumont Feb. 3, 2022, pet. denied) (mem. op.) (quoting *IKB Indus. v. Pro-Line Corp.*, 938 S.W.2d 440, 445 (Tex. 1997); *see also Ranches*

*at Hamilton Pool Homeowners Ass'n, Inc. v. Red Eagle RH, LP*, No. 08-24-00359-CV, 2025 Tex. App. LEXIS 7394, at \*6 (Tex. App.—El Paso Sept. 18, 2025, no pet.) (mem. op.) (quoting *Carrasco*, 224 S.W.3d at 366-67). In evaluating the legal sufficiency of the evidence to support a finding, we view the evidence in the light most favorable to the finding, indulging every reasonable inference supporting it. *See City of Keller*, 168 S.W.3d at 822. The ultimate test is whether the evidence allows reasonable and fair-minded people to reach the finding under review. *See id.* "A legal sufficiency challenge fails if more than a scintilla of evidence supports the finding." *Tex. Outfitters, Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). In a factual sufficiency review, we view all the evidence in a neutral light and set aside the finding only if the finding is so contrary to the overwhelming weight of the evidence such that the finding is clearly wrong and unjust. *Betancourt v. Ohmer*, No. 09-18-00121-CV, 2019 Tex. App. LEXIS 323, at \*9 (Tex. App.—Beaumont Jan. 17, 2019, no pet.) (mem. op.) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)). We review conclusions of law de novo. *See Macpherson*, 2022 Tex. App. LEXIS 7105, at \*36.

Analysis

*Offset*

In its first issue, Braverman complains that the trial court erred in calculating the third-floor damages by failing to apply an offset amount of $10,753.71.

According to Braverman's brief and Proposed Findings of Fact and Conclusions of Law, MTill relet the third floor, entitling it to receive $352,751.04 from American State Bank during the remainder of the lease term, whereas over the same period, the total amount MTill would have received from Braverman under the Amended Sublease was only $341,997.33. According to section 25(b) of the Prime Lease, the amount owed by Braverman upon termination of its right of possession is to be "diminished by any net sums thereafter received by Landlord through re-letting the Leased Premises during such period." Braverman argues that because MTill would be receiving, under the lease to the bank, $10,753.71 in excess of what it would have received under the lease to Braverman, Braverman is entitled to offset MTill's damages by $10,753.71. Braverman acknowledges that it did not plead the affirmative defense of offset but argues that the issue was tried by consent.

We need not decide whether the offset issue was tried by consent, because as pointed out in MTill's brief, section 25(b) of the Prime Lease states, "Tenant will not be entitled to the *excess* of any consideration obtained by re-letting over the rent due hereunder." (emphasis added).[1] Therefore, we conclude that regardless of whether the issue was tried by consent, Braverman is not entitled to offset damages

---

[1]As indicated above, the Sublease states the Prime Lease applies "as if the Sublessor [MTill] were Landlord under the Prime Lease and Sublessee [Braverman] were Tenant thereunder." It also provides that the "Sublessor [MTill] shall have all the rights against Sublessee [Braverman] as would be available to Landlord against Tenant under the Prime Lease if such breach was made by Tenant thereunder."

10

by the excess consideration MTill is entitled to receive by re-letting the third floor to the bank. We overrule Braverman's first issue.

*Increased CAM Rate*

In Braverman's second issue, it complains that based on the terms of the lease, the trial court erred in its calculation of second-floor damages resulting in an award that is $3,720.42 higher than justified. MTill provided evidence that the damages for the second floor totaled $121,220.67, an amount which Braverman argues improperly includes an increase in CAM that occurred after the lease was terminated.

"The ultimate goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach." *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). "The normal measure of damages in a breach-of-contract case is the benefit-of-the-bargain measure, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed." *Id.*

The evidence at trial showed that the CAM rates included in Braverman's monthly rental payments were estimates which were subject to adjustment pursuant to the Prime Lease Landlord's determination of annual operating costs; the Prime Lease Landlord increased the CAM in February 2023; and the Sublease and

11

Amended Sublease are subject to and subordinate to the Prime Lease. Had Braverman performed under the contract, it would have been subject to the increased CAM rates. Therefore, MTill's benefit-of-the-bargain damages properly included all rents that would have been paid by Braverman during the term of the lease which would have included the actual CAM rates, rather than merely the estimated CAM rates. The trial court found that effective February 2023, the CAM as determined by the Prime Landlord increased from $12.32 to $14.94 per square foot. We conclude the trial court properly included the increased CAM rate in its calculation of damages. We overrule Braverman's second issue.

*Brokerage Fees*

In its third issue, Braverman argues that brokerage fees of $21,165.06 were improperly awarded. Specifically, Braverman asserts its objections to Exhibit 8, the $7,055.02 commission invoice from Tarantino Properties to MTill, and Exhibit 9, the $14,110.04 commission invoice from J. Beard Real Estate to MTill, were improperly overruled by the trial court. Braverman objected that the invoices were hearsay, unauthenticated, and lacked foundation. Braverman argued Michael Till did not have personal knowledge of the broker's recordkeeping practices. The trial court overruled the objections and admitted the invoices as business records.

Evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per

curiam). A trial court abuses its discretion only when it rules without regard for any guiding rules or principles, and we must uphold a trial court's evidentiary ruling if there is any legitimate basis to support it. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted and is inadmissible unless a statute or rule of exception applies. Tex. R. Evid. 801(d), 802. The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004). Under the business-records exception, evidence that is otherwise inadmissible as hearsay may be admissible if the proponent of the evidence demonstrates that (1) the records were made and kept in the course of a regularly conducted business activity; (2) it was the regular practice of the business activity to create such records; (3) the records were created at or near the time of the event recorded; and (4) the records were created by, or from information transmitted by, a person with knowledge who was acting in the regular course of business. Tex. R. Evid. 803(6); *see In re E.A.K.*, 192 S.W.3d 133, 141 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). The predicate witness need not be the creator of the record nor have personal knowledge of the content of the record but rather need only have

13

personal knowledge of the manner in which the records were prepared. *In re E.A.K.*, 192 S.W.3d at 142.

A business record created by one entity that later becomes another entity's primary record is still admissible as a record of regularly conducted activity under Rule 803(6). *Martinez v. Midland Credit Mgmt., Inc.*, 250 S.W.3d 481, 485 (Tex. App.—El Paso 2008, no pet.). Third-party documents can become the business records of an organization and consequently be admissible under Rule 803(6) if the records are (1) incorporated and kept in the course of the testifying witness's business, (2) the business typically relies upon the accuracy of the contents of the documents, and (3) the circumstances otherwise indicate the trustworthiness of the documents. *Simien v. Unifund CCR Partners*, 321 S.W.3d 235, 240-41 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *Bell v. State*, 176 S.W.3d 90, 92 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd)); *Dodeka, L.L.C. v. Campos*, 377 S.W.3d 726, 732 (Tex. App.—San Antonio 2012, no pet.) (op. on reh'g); *Ortega v. Cach, LLC*, 396 S.W.3d 622, 629 (Tex. App.—Houston [14th Dist.] 2013, no pet.). "The theory underlying the business-records exception is that there is a certain probability of trustworthiness of records regularly kept by an organization while engaged in its activities and upon which it relies in the ordinary course of its activities." *Ortega*, 396 S.W.3d at 629. That said, "if 'the source of information or the method or circumstances of preparation indicate lack of trustworthiness,' even a properly

14

authenticated record may be inadmissible." *Id*. at 630 (quoting Tex. R. Evid. 803(6)). "Lack of trustworthiness is most frequently found when the record was prepared in anticipation of litigation." *Id*.

Till testified that the broker's invoices were documents that he kept in the regular course of business of MTill. Furthermore, Till's testimony indicates that his business relied upon the accuracy and the trustworthiness of those broker's invoices because he made payment on the invoices. Braverman argues that Till's testimony "brought into serious question the legitimacy of the amounts sought in these invoices[,]" because Till testified that the brokers "threw every dollar they could into their commission[]" and that the brokers "won't lease it out unless you pay their bill." Till's testimony that the brokers charged as much as they could is not testimony that they charged more than they could. The trial court could have reasonably concluded the brokers' commissions were not "inaccurate and inflated[]" as Braverman contends. No witness testified that commissions totaling 6% are excessive, nor is there testimony that the invoices, themselves, lack trustworthiness. Therefore, the trial court did not abuse its discretion in overruling the objections, admitting the invoices and relying on them in calculating the brokers' commissions in the damages award. We overrule Braverman's third issue.

*Late Fees*

In its fourth issue, Braverman argues that because the trial court used incorrect calculations for the second-floor and third-floor damages, the trial court erred in its award of late fees, arguing that the award is $1,283.66 higher than it should be. Under the terms of the leases, the amount of late fees is dependent on the amount of rent due. Because we have concluded that the trial court correctly calculated the damages for the third floor and second floor, it follows that the calculation of late fees is correct as well. We overrule Braverman's fourth issue.

*Attorney Fees*

In its fifth issue, Braverman complains that the trial court's award of attorney fees is excessive and should be reduced by $25,329.29. Braverman argues that because the trial court awarded MTill only $153,418.11 in damages, representing only 32.45% of the $472,745.52 sought by MTill, the trial court should have reduced MTill's attorney fees accordingly. Braverman cites *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 546 (Tex. 2009), for the proposition that "where a party has recovered less than a third of the damages sought, a court's award of the full amount of attorney fees sought is unreasonable."

In *Smith*, the plaintiff sought around $215,000 in damages, but the jury awarded only $65,000 in damages and no attorney fees. Notwithstanding the jury's finding, the trial court rendered a judgment that included attorney fees of $7,500

16

through trial and up to $15,000 on appeal. The court of appeals affirmed the damage award but vacated the $7,500 in attorney fees and rendered judgment for $47,438.75 in attorney fees, holding that this amount had been established as a matter of law. *Id.* at 546-47. The Supreme Court reversed and remanded for a new trial on attorney fees, holding that "[b]ecause the fee is unreasonable in light of the amount involved and the results obtained, the evidence did no more than raise a fact issue to be decided by the jury" and that "the court was not free to set a reasonable fee on its own." *Id.* at 548.

*Smith* does not support Braverman's argument that an attorney-fees award must be proportional to the ratio between the damages awarded and the damages sought. The Supreme Court did not reverse and render judgment for an amount proportional to the damages award. Instead, it held the amount of attorney fees was a fact question to be decided in a new trial, reasoning that even when attorney-fee evidence is uncontradicted, such fees are not to be regarded as established as a matter of law if the amount may be considered unreasonable, incredible or of questionable belief. *Id*. at 547-48 (citing *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990)). Therefore, *Smith* simply reiterates that the amount of attorney fees must be reasonable given the circumstances and that "the amount involved and the results obtained" are factors to be considered by the factfinder in determining a reasonable fee. *See id.* at 548 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*,

17

945 S.W.2d 812, 818 (Tex.1997)). Here, the factfinder was the trial judge, and the evidence supports her finding that $37,498.53 is a reasonable and necessary attorney fee given the circumstances and *Arthur Anderson* factors, including the amount involved and the results obtained. We overrule Braverman's fifth issue.

Conclusion

Having overruled all of Braverman's issues, we affirm the trial court's judgment.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on May 29, 2026
Opinion Delivered June 25, 2026

Before Johnson, Wright and Chambers, JJ.